**Neville RANGOLAN and Shirley Rangolan, Plaintiffs,**

v.

**The COUNTY OF NASSAU and The Nassau County Sheriff's Department, Defendants.**

**No. CV 97–3343(ADS).**

United States District Court, E.D. New York.

May 28, 1999.

Ginsberg & Broome, LLP, New York City, by Robert M. Ginsberg, of counsel, for plaintiffs.

Montfort, Healy, McGuire & Salley, Garden City, NY, by James J. Keefe, Jr., Special Counsel to Owen B. Walsh, County Attorney, for defendants.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

In all stages of litigation, it is a Judge's duty to see that there is not a miscarriage of justice. In terms of whether a jury award of damages should be reduced, the Court is mindful that the critical issue is not whether the Court would have

reached the same conclusion as a jury of women and men who listened to the evidence presented at the trial. Rather, before interfering with a jury award, the Court must reach the conclusion that the awards to the plaintiffs were excessive under the appropriate legal standard. In this case, the Court must determine whether the awards materially deviated from what would be reasonable compensation in light of the injuries and damages suffered. While reluctant to modify a determination made by a jury, this Court is confronted with the task of reconciling the defendant's acknowledged blunder, which led to the injuries suffered by the plaintiff and the resulting $1,250,000 award to Neville Rangolan for future pain and suffering, and the $60,000 award to Shirley Rangolan for the loss of services of her husband. In the Court's view, these awards cannot stand.

On March 9, 1996, Neville Rangolan (the "plaintiff" or "Rangolan") was assaulted by another inmate while in custody at the Nassau County Correctional Center ("NCCC"). Steven King, the inmate who assaulted Rangolan, was in custody as a result of Rangolan's cooperation with the Nassau County Police in connection with a "controlled buy" of crack cocaine. Due to Rangolan's cooperation that led to King's arrest, a computer entry was placed in the Housing and Assignment Department of the NCCC stating that the two inmates were not to be housed in the same jail area. Despite this express notification, King and Rangolan were permitted to be in the same "jail pod," and in close enough proximity for Rangolan to be assaulted by King and seriously and permanently injured.

As a result of this incident and the injuries he suffered, Rangolan filed a complaint that sets forth two causes of action. First, that the Nassau County Sheriff's Department violated his civil rights pursuant to 42 U.S.C. § 1983 (the "Section 1983 claim") based on the deliberate indifference of the defendants. The second cause of action, a New York State common law claim, asserted that the defendants were negligent in permitting the two inmates to be housed in the same jail area notwithstanding the express warning noted in the computer. In addition, Rangolan's wife, Shirley, was named as a plaintiff in a derivative action seeking damages for the loss of services of her husband.

At the close of the evidence, the Court granted the defendant's motion for a judgment as a matter of law as it pertained to the Section 1983 claim. The Court held that the plaintiffs failed to prove that the County was "deliberately indifferent" in permitting the two inmates to be housed together. In particular, the plaintiffs failed to prove that anyone at the NCCC actually knew that the two inmates were housed together. With regard to the negligence cause of action, the Court granted judgment as a matter of law, in favor of Neville Rangolan with respect to negligence and proximate cause. This was based, in part, on the admission by Correction Officer Donald Sherlock that he inadvertently failed to see the entry in the computer that indicated that Rangolan and King were not be housed in the same "jail pod."

After these decisions, the only remaining issues for the jury to decide, in the common law negligence cause of action, was (1) whether Rangolan was contributorily negligent; (2) if so, whether Rangolan's contributory negligence was also a proximate cause of his injuries; and (3) the amount of damages.

On April 27, 1999, the jury found that although Rangolan was contributorily negligent, his negligence was not a proximate cause of his injuries. In addition, the jury awarded damages to Neville Rangolan for his injuries and his past pain and suffering in the amount of $300,000 and $1,250,000 for future pain and suffering. The jury also awarded $60,000 to Shirley Rangolan for loss of services of her husband.

Pursuant to Rule 59(a) of the Federal Rules of Civil Procedure, the defendant made a timely motion for a new trial on the liability issues and on the issue of damages with respect to all three awards. The Court denied the defendant's motion based on an alleged inconsistent verdict as to the contributory negligence issue. Based on the evidence, the Court ruled that a reasonable jury could have determined that there was contributory negligence on the part of Rangolan, but that the vicious nature of the attack by King was the sole cause of the injuries.

The Court also denied the defendant's motion with respect to the jury award to Neville Rangolan in the sum of $300,000 for his injuries and past pain and suffering. However, the Court reserved decision with regard to the award of $1,250,000 for future pain and suffering and the $60,000 award to Shirley Rangolan for loss of her husband's services. The only issues presently before the Court, therefore, are whether the $1,250,000 award to Neville Rangolan for future pain and suffering and the $60,000 award to Shirley Rangolan's for loss of her husband's services deviate materially from what would be considered reasonable compensation for the injuries and residuals suffered.

## I. BACKGROUND

The following facts are taken from the testimony adduced at the trial. Neville Rangolan is currently 36 years of age, and has a 39 year life expectancy. He was born in Jamaica, attended school to the sixth grade, and in 1980, at the age of 18, came to the United States. At this time, Neville Rangolan apparently is an illegal immigrant and is incarcerated while awaiting a deportation hearing scheduled for August, 1999. Neville and Shirley Rangolan were married in 1987 and have three children. In 1988, Neville began engaging in criminal activity involving the sale of cocaine and crack-cocaine. In 1990, he was arrested in Florida and extradited to New York where he plead guilty to at-

tempted criminal sale of a controlled substance in the third degree. Rangolan was sentenced to 6½ months.

After being released, Rangolan was arrested on a marijuana charge by Detective Charles App, a Nassau County Detective. At the suggestion of Detective App, Rangolan was enlisted as a confidential informant and made a "controlled-buy" from Steven King, which led to King's subsequent arrest. Despite his cooperation agreement, Rangolan apparently continued his criminal behavior. Shortly after assisting in the arrest of King, Rangolan was himself arrested for the sale of a controlled substance and plead guilty on August 8, 1996 to attempted criminal sale of a controlled substance in the fifth degree. He was sentenced to 2–4 years on this charge. When Rangolan was arrested, Detective App informed Investigator Kenneth Williams in the NCCC that informant Rangolan and King must be housed separately. Williams prepared a memorandum stating that the two prisoners must be housed separately, and an entry was placed in the computer system with the same warning.

Correction Officer Donald Sherlock was assigned to the Housing and Assignment unit. His duty was to check and verify all admissions and reassignments of inmates and decide where they should be housed, based on the past history of the inmate and any other relevant factor that would necessitate the separation of inmates. There was no issue at trial that the computer used at the Housing and Assignment unit contained an entry that specifically warned that King was not to be housed with Rangolan. There was also another entry that King was not to be housed with another inmate named Jackson. According to Sherlock, when he looked at the computer entry, he saw that King and Jackson were not to be housed together. He testified that he was then distracted by a phone call and never saw the second entry that indicated that King and Rangolan must be kept apart. He testified that

he just "missed" the King–Rangolan computer warning. Sherlock admitted that if he saw the computer entry he would have separated King and Rangolan. In addition, Sherlock indicated that at the time, he was the only correction officer who had access to the computer

As a result of Sherlock's admitted negligence, Rangolan and King were placed in the same location on March 8, 1996. Although there was a conflict in the testimony as to where Rangolan was assaulted and whether he was hit by King with a broom handle, it was not disputed by the defendant that on March 9, 1996 Rangolan was severely beaten by King while both men were housed together contrary to the express instructions in the computer. As a result of the assault, Rangolan was taken to the Nassau County Medical Center, and was in a comma for approximately three days.

The plaintiff's medical expert, Dr. Jay Rosenblum, a neurologist, examined Rangolan on behalf of the plaintiff's counsel, just prior to the trial, on April 5, 1999. Dr. Rosenblum reviewed the Nassau County Medical Center hospital records. He testified that Rangolan had suffered a right sided depressed skull fracture with a small subarachnoid hemorrhage. In addition, Dr. Rosenblum noted that Rangolan had bleeding from the brain and compression of the brain. As a result, emergency surgery was performed to stop the bleeding and to repair the bone with the insertion of plates. Dr. Rosenblum testified that Rangolan sustained a cerebral concussion with post concussion syndrome and headaches, a fractured skull, a circular scar on the side of the head, and organic brain damage diagnosed as post-traumatic seizure disorder.

In Dr. Rosenblum's opinion, Rangolan's residual injuries were: (1) headaches; (2) depression; and (3) seizures. It should be noted that the record did not indicate how many seizures the plaintiff had suffered prior to December 1998. Also, it was conceded by the plaintiff that he had not had a seizure since December 1998, a period of four months, as a result of taking Dilantin medication. Dr. Rosenblum concluded that, in his opinion, even with Dilantin medication, Rangolan will have seizures in the future. However, he was unable to quantify the number and frequency of the predicted future seizures.

The defendant's expert, Dr. Robert S. April, a neurologist, examined Rangolan on behalf of defendant's counsel, on April 8, 1999 at the Metropolitan Detention Center. Dr. April's opinions did not differ substantially from those of Dr. Rosenblum. Dr. April confirmed that Rangolan was operated on to repair a skull fracture and remove an intracerebral hemorrhage. Dr. April testified that Rangolan suffered organic brain damage and a significant cranial injury. As a result of the injuries, Dr. April testified that Rangolan was diagnosed with post-traumatic epilepsy and placed on Dilantin. Dr. April's report, which was entered into evidence, indicates that Rangolan had no seizures since December 1998. In his medical opinion, Rangolan's post-traumatic epilepsy can be controlled through medication. Dr. April testified that if Rangolan continued to take Dilantin, he would, with a reasonable degree of medical certainty, expect "zero" future seizure frequency. Dr. April also confirmed that Rangolan was depressed, but did not suffer any organic disfunction of the brain.

On the issue of damages, Neville testified that he "had a number" of seizures following the assault, but was not more specific. During the seizures, Rangolan testified that he foamed at the mouth, shook, hit himself, and threw himself around. Rangolan also testified that he is presently on medication for the seizures and suffers from headaches and depression.

On the issue of loss of services, Shirley Rangolan testified that she and Neville had been living together one year prior to being married and after their marriage in

1987 until 1996, when Neville was sentenced to 2–4 years on the felony drug charge. Ultimately, in February, 1997, the Immigration and Naturalization Service filed a detainer warrant, and transferred Rangolan to a correctional facility in Pennsylvania, with the intention of deporting him to Jamaica. To this date, Rangolan is in custody awaiting a hearing in August, 1999 on the detainer warrant. Thus, Shirley and Neville have not lived together since 1996.

Shirley Rangolan testified that while Neville was in custody in New York she had regular phone contact with him and visited him periodically. After being assaulted, Shirley testified that she was with him in the hospital and did not leave his side. After being transferred to Pennsylvania in 1997, she has visited him only six times.

## II. DISCUSSION

■ It is a basic tenet that, in reviewing a motion for a new trial on the ground that the jury's award of damages was excessive, the court must "accord substantial deference to the jury's determination of factual issues." *Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 683 (2d Cir.1993) (citing *Martell v. Broadwalk Enters.*, 748 F.2d 740, 750 [2d Cir.1984] ).

■ It is important to note, and both counsel agree, that the standard to be applied in deciding the issue of the asserted excessiveness of the jury's verdict is the standard set forth in New York CPLR 5501(c), namely, whether the award "deviates materially from what would be reasonable compensation." *See Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 419, 116 S.Ct. 2211, 2215, 135 L.Ed.2d 659 (1996) (holding that "New York's law controlling compensation awards for excessiveness or inadequacy can be given effect, without detriment to the Seventh Amendment, if the review standard set out in CPLR § 5501(c) is applied by the federal court judge . . . .")

With this standard in mind, and the facts outlined above, the Court will review the jury's award of $1,250,000 for future pain and suffering to Neville Rangolan, and $60,000 for loss of his services to Shirley Rangolan, to determine whether these awards deviate materially from what would be reasonable compensation.

### A. *Future Pain and Suffering*

Viewing the evidence in the light most favorable to the plaintiffs, as the Court is required to do, the evidence on future pain and suffering can be summarized as follows. Neville Rangolan suffers from headaches, depression, a circular scar on his head that can be concealed by his hair, and most significantly, he will live with the potential fear of having seizures in the future. It should be noted, however, that the number and frequency of these future seizures is unknown as he is under Dilantin medication, which apparently has, to the date of the trial, ameliorated this condition.

In reviewing the testimony elicited with regard to the injuries sustained by Neville, the Court notes that there is a lack of evidence on some injury and damage issues. There was no testimony that Neville's speech, motor skills, or thinking, was or would be effected in any way by the injuries to the brain. In addition, while Rangolan has a circular scar on the right side of his head, at the trial his hair was cut extremely short so that the scar was visible. It appears that longer hair would cover the scar.

■ While no two cases are alike, it is proper for the Court to review other recent awards approved by the courts of the state whose substantive law governs. *Martell v. Boardwalk Enterprises*, 748 F.2d 740, 750 (2d Cir.1984). A sampling of New York State decisions analyzing situations with similar injuries, therefore, is instructive.

In *Holland v. Gaden*, 1999 WL 247749 (2d Dep't April 26, 1999), the Second De-

partment reduced a jury verdict to the plaintiff for future pain and suffering from $500,000 to $250,000 where the plaintiff suffered a fractured tibia, fibula, and glenoid as a result of being struck by the defendant's bus. The plaintiff's injuries required limited open reduction surgery and the insertion of a metal bar affixed by pins, as well as two subsequent surgeries which required irrigation, debridement, and a skin graft. The plaintiff remained in the hospital for one month and thereafter spent five months in rehabilitation due to additional residual damages. The plaintiff testified that she still experiences pain in her left leg, has limited use of her arm, and is now unable to participate in her former lifestyle.

In *Martino v. Triangle Rubber Co., Inc.,* 249 A.D.2d 454, 671 N.Y.S.2d 524 (2d Dep't 1998), the Second Department reduced an award for future pain and suffering from $330,000 to the sum of $130,000 where the plaintiff suffered a concussion with resulting post traumatic encephalopathy, a contusion, and chondromalacia of the knee, i.e. damage to the cartilage, a chronic cervical lumbosacral sprain, and two herniated discs.

In *Lauter v. Village of Great Neck,* 231 A.D.2d 553, 647 N.Y.S.2d 524 (2d Dep't 1996), the Second Department held that an award of $1.2 million for past pain and suffering and $700,000 for future pain and suffering was excessive when the injuries were a shattered jaw, severe facial lacerations and nerve damage resulting in partial paralysis of face, permanent disfigurement, and serious arm and chest wounds. The Second Department reduced both awards and, in particular, lowered the award for future pain and suffering from $700,000 to $500,000.

In *Bartlett v. Snappy Car Rental, Inc.,* 214 A.D.2d 596, 626 N.Y.S.2d 499 (2d Dep't 1995), a case where the plaintiff suffered. severe headaches and "essential tremors" that prevented her from leading a normal and active life, the Court reduced the future pain and suffering from $350,000 to $250,000.

The plaintiffs cite *Suarez v. City of New York,* 186 A.D.2d 415, 589 N.Y.S.2d 10 (1st Dep't 1992) and *Hernandez v. City of New York,* 156 A.D.2d 641, 549 N.Y.S.2d 139 (2d Dep't 1989), in support of their contention that the jury award was reasonable. The Court finds these cases to be unpersuasive. The Court notes that the First Department's finding in *Suarez* that an award of $1.6 million to a plaintiff who was beaten by several police officers was reasonable, but involved much more severe injuries than those sustained by Neville Rangolan. The injuries sustained by the plaintiff in *Suarez* included permanent disfigurement to the left frontal region of the head, post-concussion syndrome, suicide attempts, and loss of business and political aspirations.

Similarly, the Second Department's decision in *Hernandez* involved dramatically different injuries than those suffered by Rangolan. In *Hernandez,* the Court increased awards to an infant plaintiff, Wilfredo Hernandez, from $125,000 to $750,000 and to the infant plaintiff's grandmother, Carmen LeBron, from $115,000 to $350,000 after a fire occurred in a city-owned apartment building and both had to jump, due to a rusty fire escape ladder that was unusable, from the second floor. Wilfredo suffered a linear fracture of his skull and swelling to the back of his head. In addition, there was testimony at the trial that he suffered a permanent personality disorder and learning disability as a result of the fall and that his prognosis for recovery was poor as the damage to the brain tissue was irreparable. With regard to Carmen LeBron, the testimony at trial disclosed that she incurred a fragmented fracture of the weight-bearing bones of both feet, a permanent walking disability, daily use of a wheelchair to ambulate, continued pain and suffering, and a depressed psychiatric state. It is the Court's view that the injuries suffered by

Wilfredo Hernandez and Carmen LeBron are more severe than those of Neville Rangolan. The injuries suffered by Hernandez and LeBron are of a daily permanent nature. LeBron must permanently use a wheel chair, and Hernandez appears to have permanent brain damage that has effected his ability to learn. Given the nature of these injuries, it is not surprising that the Second Department modestly increased the amount of their awards to $750,000 and $350,000, respectively, both well below the amounts awarded by the jury in this case.

In *Holland, Martino, Lauter* and *Bartlett* New York appellate courts approved awards of $250,000, $130,000, $350,000 and $250,000, respectively, for future pain and suffering where the injuries to the plaintiffs included: (1) a fractured tibia, fibula, and glenoid, a shattered jaw, insertion of a metal bar affixed by pins, as well as two subsequent surgeries which required, among other things a skin graft; (2) post traumatic encephalopathy and chondromalacia of the knee, i.e. damage to the cartilage, a chronic cervical lumbosacral sprain, and two herniated discs; (3) severe facial lacerations and nerve damage resulting in partial paralysis of the face and permanent disfigurement, serious arm and chest wounds, and severe headaches; and (4) essential "tremors" that prevented the plaintiff from leading a normal and active life.

While the Court fully appreciates the serious nature of the injuries sustained by Neville Rangolan, other than the fear of possible future seizures and future seizures if they occur, there was no evidence adduced at trial that he will be unable to lead a normal and healthy life after his release from prison.

Rangolan's primary future injury is the potential for having other seizures. Even assuming that, despite the Dilantin medication, he is at risk of suffering seizures, the Court is of the opinion that a jury award of $1,250,000 for living with the risk of potential seizures, coupled with the oth-

er relatively minor residual injuries, deviates materially from what would be reasonable compensation.

The Court is of the view that reasonable compensation for the residual fear of living with the possibility of having seizures, and the possibility of future seizures, coupled with headaches and depression, which latter symptom would be alleviated if the plaintiff were not in custody, is the sum of $500,000.

### B. *Loss of Services*

Loss of consortium "embraces such elements as love, companionship, affection, society, sexual relations, solace and more." *Millington v. Southeastern Elevator Co.,* 22 N.Y.2d 498, 502, 293 N.Y.S.2d 305, 308, 239 N.E.2d 897 (1968); *see also Battista v. United States,* 889 F.Supp. 716, 729 (S.D.N.Y.1995). The cause of action for loss of services compensates an "injured party's spouse in the continuance of a healthy and happy marital life." *Millington,* 22 N.Y.2d at 504–05, 293 N.Y.S.2d at 309–10, 239 N.E.2d 897. With regard to the loss of services, it should be noted that there was no evidence adduced as to any services that Neville Rangolan performed for his wife. There was no testimony that Neville took care of the children, helped around the home, or for that matter, provided any financial, moral, or spiritual assistance. In addition, the loss of services of Neville Rangolan was minimal following his incarceration commencing on August 8, 1996 and extending to the present date.

It would be engaging in some speculation for the Court to surmise what actual loss of services were sustained by Shirley Rangolan as a result of Neville's injuries. There is virtually no evidence of any services performed by Neville prior to the date his injuries were sustained. In addition, it is difficult for the Court to imagine, and the evidence has not revealed, how Shirley has suffered loss of services while her husband has been in custody since 1996, and is presently in the

process of being deported to Jamaica. The loss of services during Neville's period of incarceration is due to his imprisonment, not as a result of his injuries.

It is difficult for the Court to fairly appraise Shirley Rangolan's claim that she lost the services of her husband after he was assaulted by fellow inmate King in prison on March 9, 1996. The loss of services must be measured from the date of the assault. As stated above, between that date and the present time, during which period Neville was incarcerated, there was only minimal loss of services. According to the evidence, Shirley Rangolan visited her husband only six times while he was incarcerated in Pennsylvania.

While Shirley Rangolan testified that if Neville is deported to Jamaica she will join him, it is difficult to visualize what loss of services will result from Neville's residual damages, namely depression, headaches, and possible seizures. Significantly, as stated above, neither Neville nor Shirley testified as to what services, if any, Neville provided prior to this incarceration. There was simply no evidence elicited of loss of companionship or society caused by the injuries in this case. However, some of these characteristics can be reasonably inferred from the state of marriage itself.

The Court finds that the sum awarded, $60,000, for such unproved and speculative loss of services deviates materially from a reasonable jury award. Giving the plaintiffs every benefit of the evidence, the Court is of the view that a reasonable jury award for Shirley Rangolan's loss of services should not have exceeded the sum of $20,000.

Having reviewed the parties' submissions and afforded them the opportunity to present oral argument, it is hereby

**ORDERED,** that the defendant's Rule 59(a) motion for a new trial on the issue of damages as to Neville Rangolan's future pain and suffering is hereby **GRANTED** unless the plaintiff Neville Rangolan accepts a remittitur of damages in the amount of $500,000. A new trial on the issue of damages will commence on October 11, 1999 at 9:00 AM unless the plaintiff Neville Rangolan files a remittitur with this Court on or before July 14, 1999; and it is further

**ORDERED,** that the defendant's Rule 59(a) motion for a new trial on the issue of damages with regard to Shirley Rangolan's loss of services claim is hereby **GRANTED** unless the plaintiff Shirley Rangolan accepts a remittitur of damages in the amount of $20,000. A new trial on the issue of damages will commence in her case on October 11, 1999 at 9:00 AM, unless plaintiff Shirley Rangolan files a remittitur with this Court on or before July 14, 1999.

**SO ORDERED.**