Neville **RANGOLAN** and Shirley Rangolan, Plaintiffs–Appellees–Cross–Appellants,

v.

**THE COUNTY OF NASSAU** and Nassau County Sheriff's Department, Defendants–Appellants–Cross–Appellees.

No. 03–7367, 03–7835.

United States Court of Appeals, Second Circuit.

Submitted: Feb. 17, 2004.

Decided: June 2, 2004.

240

Ginsberg & Broome, New York, NY (Robert M. Ginsberg, New York, NY, of

counsel), for Plaintiffs–Appellees–Cross–Appellants.

Lorna B. Goodman, County Attorney of Nassau County, Mineola, NY (Dennis J. Saffran, David B. Goldin, Deputy County Attorneys, Mineola, NY, James J. Keefe, Jr., Montfort, Healy, McGuire & Salley, Garden City, NY, of counsel), for Defendants–Appellants–Cross–Appellees.

Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Brooklyn, NY (Varuni Nelson, Assistant United States Attorney, Brooklyn, NY, of counsel), for the United States as Amicus Curiae.

Before: KEARSE, CABRANES, and KATZMANN, Circuit Judges.

KEARSE, Circuit Judge.

Defendants County of Nassau and Nassau County Sheriff's Department (collectively the "County") appeal from (1) an "Amended Judgment" entered in the United States District Court for the Eastern District of New York on March 31, 2003 ("2003 Judgment"), Denis R. Hurley, *Judge*, which ordered defendants to pay plaintiffs Neville Rangolan ("Rangolan") and Shirley Rangolan ("Shirley") (collectively "the Rangolans") a total of $820,000 in damages, plus interest dating from October 1, 1999, on their state-law claims for negligence resulting in injuries to Rangolan while he was in the County's custody, and (2) a judgment dated October 1, 1999 ("1999 Judgment"), Arthur D. Spatt, *Judge*, which, *inter alia*, taxed costs of $4,792.46 against defendants in favor of the United States Marshals Service ("Marshals Service" or "USMS") for the expense of transporting Rangolan to and from, and guarding him during, his court appearances in the present action. On appeal, the County contends that the $820,000 award to the Rangolans is excessive and that the

award of costs to the Marshals Service is unauthorized. The Rangolans have cross-appealed from so much of the 2003 Judgment as, in light of their acceptance of conditional remittiturs ordered in *Rangolan v. County of Nassau*, 51 F.Supp.2d 236, 244 (E.D.N.Y.1999) ("*Rangolan I*"), reduced to $820,000 the jury's award to them of $1,610,000. They contend that the jury's award was not excessive and should not have been reduced. For the reasons that follow, we dismiss the cross-appeal; we affirm the 2003 Judgment awarding the Rangolans $820,000 plus interest; and we vacate so much of the 1999 Judgment as ordered the County to pay $4,792.46 in costs to the Marshals Service, and we remand for further proceedings with respect to such costs.

## I. BACKGROUND

This case returns to us following a variety of proceedings, including a prior appeal, *see Rangolan v. County of Nassau*, 217 F.3d 77 (2d Cir.2000) ("*Rangolan II*"); the resolution by the New York Court of Appeals of a certified question of state law, *see Rangolan v. County of Nassau*, 96 N.Y.2d 42, 725 N.Y.S.2d 611, 749 N.E.2d 178 (2001); a remand to the district court for trial of a limited issue relating to the possible apportionment of plaintiffs' damages, *see Rangolan v. County of Nassau*, Nos. 99–9343, 99–9397 (2d Cir. May 18, 2001); and entry of the 2003 Judgment following the limited trial.

The events leading to the County's liability to the Rangolans are described in greater detail in the reported opinions cited above, familiarity with which is assumed. The events are described briefly below to the extent that they are relevant to the two issues remaining to be resolved here: whether the damages awarded to the Rangolans are excessive, and whether the district court had authority to require

the County to pay USMS the cost of transporting and guarding Rangolan.

A. *The Damages Awarded to the Rangolans*

In March 1996, Rangolan was an inmate at the Nassau County Correctional Center ("NCCC"). He had previously cooperated with law enforcement officials in the investigation of one Steven King by participating in a controlled purchase of narcotics from King. After King was arrested, an official instruction was given and recorded in the NCCC computer that King and Rangolan should not be housed in the same dormitory. However, the prison official in charge of NCCC housing assignments failed to notice that instruction, and on March 8, King was moved to the dormitory in which Rangolan was housed. On March 9, King beat Rangolan severely, inflicting head injuries that left Rangolan in a coma for six days, necessitated surgery, and caused subsequent seizures and other ill effects. Rangolan's condition resulting from that assault is described in greater detail in Part II.A.1. below.

In June 1997, Rangolan brought suit against the County and others under 42 U.S.C. § 1983 and state law; Shirley asserted a state-law claim for loss of consortium. At a jury trial in April 1999, the § 1983 claims were dismissed at the close of the evidence. The state-law claims for negligence were submitted to the jury, which returned a verdict in favor of Rangolan of $300,000 for past pain and suffering and $1,250,000 for future pain and suffering, and awarded Shirley $60,000 for loss of consortium.

The County moved for, *inter alia*, a new trial on the ground that the damages awards were excessive. The district court orally denied the motion to the extent that it challenged the $300,000 award for Rangolan's past pain and suffering, and it re-

served decision as to the other awards. In *Rangolan I*, the court considered the jury's awards of $1,250,000 to Rangolan for future pain and suffering and $60,000 to Shirley for loss of consortium in comparison to awards approved by New York courts for "similar injuries," 51 F.Supp.2d at 241, and was persuaded that the jury's awards " 'deviate[d] materially from what would be reasonable compensation,' " *id.* (quoting N.Y. C.P.L.R. 5501(c) (McKinney 1995)). The court concluded that

> reasonable compensation for the residual fear of living with the possibility of having seizures, and the possibility of future seizures, coupled with headaches and depression, which latter symptom would be alleviated if the plaintiff were not in custody, is the sum of $500,000.

*Id.* at 243. The court also concluded that the $60,000 award to Shirley for loss of consortium was excessive, and that an award of $20,000 to her would be appropriate. *See id.* at 243–44.

In light of these conclusions, the court ruled that the County's motion for a new trial would be granted with respect to the issues of damages (a) for Rangolan's future pain and suffering unless Rangolan agreed to a remittitur of the jury's $1,250,000 verdict to $500,000, and (b) for Shirley's loss of consortium unless Shirley agreed to a remittitur of the jury's $60,000 verdict to $20,000. *See id.* at 244. The Rangolans agreed to accept the reduced awards. Accordingly, the 1999 Judgment was entered in the Rangolans' favor, awarding Rangolan $300,000 for past pain and suffering and $500,000 for future pain and suffering, and awarding $20,000 to Shirley for loss of consortium. Following proceedings leading to a determination that the County was not entitled to have the Rangolans' damages apportioned between itself and King, the 2003 Judgment was entered, reflecting the damages

awards made to the Rangolans in the 1999 Judgment.

### B. *The Marshals Service's Request for Reimbursement*

In early 1997, Rangolan had completed his state sentence and, as an illegal alien, had been remanded to federal custody for deportation proceedings. Thereafter, as discussed in greater detail in Part II.B.1. below, the district court in the present case issued writs of habeas corpus *ad testificandum* in order to have Rangolan produced for trial and other court appearances. The Marshals Service brought Rangolan to court for those proceedings and, while he was there, guarded him.

After the jury returned its verdicts against the County, USMS submitted to the district court a request pursuant to 28 U.S.C. §§ 1920 and 1921 that the costs to be taxed against the County include $4,792.46 to reimburse USMS for transporting, guarding, and providing meals for Rangolan in connection with his court appearances. (*See* Hearing Transcript, August 11, 1999, at 29; Hearing Transcript, September 22, 1999 ("Sept. Hearing Tr."), at 5.) The County objected, contending principally that there was no authorization for taxing as costs either the expenses incurred by USMS or a party's mileage or subsistence. The County urged the court to tax the USMS costs against the Rangolans because defendants were not responsible for Rangolan's detention.

The district court ruled that USMS was entitled to be reimbursed by the County in the amount requested. The court stated that under 28 U.S.C. § 1920, "[a] judge or clerk of any court of the United States may tax as costs the following: One, fees of the clerk, and marshal" (Sept. Hearing Tr. 3), and that under 28 U.S.C. § 1921, marshals' fees may include "necessary travel in serving or endeavoring to serve any process, writ or order" (Sept. Hearing Tr. 3). The court also noted that regulations promulgated by the United States Attorney General provide that USMS "shall routinely collect fees" for process served or executed "plus travel costs and any other out of pocket expenses," including the "receipt, processing and transportation of prisoners held in the custody of a marshal or transported by the United States Marshal[s] Service under cooperative or intergovernmental agreements" (Sept. Hearing Tr. 4), and that "there is an intergovernmental agreement" (*id.*). The court rejected the County's contention that USMS's reimbursement should come from the Rangolans, stating that "the prevailing party shouldn't pay costs, the tort feasor [*sic*] should pay costs and the defendant is the tort feasor [*sic*]" (Sept. Hearing Tr. 7). Accordingly, the 1999 Judgment ordered the County to pay the Marshals Service costs totaling $4,792.46.

## II. DISCUSSION

On the present appeal, the County pursues its contentions that the $820,000 awarded to the Rangolans is excessive and that the district court lacked authority to tax costs against the County in favor of the Marshals Service. The Rangolans have cross-appealed, contending that the district court's order in *Rangolan I* granting a new trial unless they agreed to reductions of the amounts awarded by the jury for future pain and suffering and loss of consortium constituted an abuse of discretion.

We dismiss the cross-appeal. When a plaintiff has agreed to a conditional remittitur order, he is not allowed to challenge it, seeking an increase of the reduced award, either by appealing, *see, e.g., Donovan v. Penn Shipping Co.,* 429 U.S. 648, 649, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977) (per curiam); *Kennon v. Gilmer,* 131 U.S. 22, 29–30, 9 S.Ct. 696, 33 L.Ed.

110 (1889), or by filing a cross-appeal, *see, e.g., Woodworth v. Chesbrough,* 244 U.S. 79, 82, 37 S.Ct. 583, 61 L.Ed. 1005 (1917); *Koenigsberger v. Richmond Silver Mining Co.,* 158 U.S. 41, 52, 15 S.Ct. 751, 39 L.Ed. 889 (1895); *Fiacco v. City of Rensselaer,* 783 F.2d 319, 333 (2d Cir.1986) ("A line of decisions stretching back into the past century has established that when a plaintiff has agreed to a remittitur order, he cannot challenge it either on an appeal ... or on a cross-appeal ...."), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987). The Rangolans having accepted reductions of the jury awards rather than submit to a new trial, they cannot challenge the reductions.

As to the County's appeal, we conclude for the reasons that follow that the district court did not abuse its discretion in refusing to reduce the jury's award for past pain and suffering or in deciding the extent to which the other damages awards should be reduced. However, the court lacked authority to award costs to USMS except to reimburse it for (a) if USMS served the writs of habeas corpus *ad testificandum* on immigration officials, its fees and mileage expense for serving the writs, and (b) so much of its expense in executing the writs, by transporting and guarding Rangolan, as constituted overtime.

### A. *The Reasonableness of the Damages Awards to the Rangolans*

In an action brought to recover damages for personal injury under New York law, a monetary judgment is excessive "if it deviates materially from what would be reasonable compensation." N.Y. C.P.L.R. 5501(c) (McKinney 1995); *see* N.Y. C.P.L.R. 4111(f) (McKinney 1992); *see generally Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 418, 423–25, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). A district court applying this standard "re-views the evidence presented at trial in support of the challenged damage award and compares the award to other New York cases in which evidence of similar injuries was presented." *Presley v. United States Postal Service,* 317 F.3d 167, 173 (2d Cir.2003); *see, e.g., Gasperini,* 518 U.S. at 438–39, 116 S.Ct. 2211. If the district court finds that the verdict, by this standard, is excessive, it has discretion to "order[ ] a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Id.* at 433, 116 S.Ct. 2211.

Where the basis for the remittitur order is the district court's view that the award is "intrinsically excessive," *i.e.,* is greater than the amount a reasonable jury could have awarded but the excess is not attributable to a discernible error, *see, e.g., Kirsch v. Fleet Street, Ltd.,* 148 F.3d 149, 165 (2d Cir.1998) (internal quotation marks omitted), the court should reduce the award "only to the maximum amount that would be upheld by the district court as not excessive," *Earl v. Bouchard Transportation Co.,* 917 F.2d 1320, 1330 (2d Cir.1990), for one "objective [of a conditional remittitur] is to minimize the extent of judicial interference with a matter that is otherwise within the jury's domain," *id.* at 1328; *see, e.g., Johnston v. Joyce,* 192 A.D.2d 1124, 1125–26, 596 N.Y.S.2d 625, 626 (4th Dep't 1993) (mem.) (reducing award to maximum amount previously allowed for injuries of similar severity). "[R]eduction only to the highest amount that the jury could properly have awarded" "is the only theory that has any reasonable claim of being consistent with the Seventh Amendment." 11 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2815, at 167–68 (2d ed.1995); *see Earl v. Bouchard Transportation Co.,* 917 F.2d at 1328 (remittitur to the highest

such amount "is the most faithful to the jury's verdict").

Where the district court has decided whether and/or to what extent the jury's verdict was excessive, its decision is reviewable only for abuse of discretion.

Within the federal system, practical reasons combine with Seventh Amendment constraints to lodge in the district court, not the court of appeals, primary responsibility for application of § 5501(c)'s "deviates materially" check. Trial judges have the unique opportunity to consider the evidence in the living courtroom context, ... while appellate judges see only the cold paper record ....

*Gasperini,* 518 U.S. at 438, 116 S.Ct. 2211 (internal quotation marks omitted). Thus, "appellate control of the trial court's ruling [is] limited to review for 'abuse of discretion.'" *Id.* at 419, 116 S.Ct. 2211.

### 1. *The Damages Awarded to Rangolan for Pain and Suffering*

In the present case, the evidence at trial as to the injuries suffered by Rangolan, which we view in the light most favorable to Rangolan as the party in whose favor the jury found, included the following. As a result of King's assault, Rangolan was knocked unconscious, and emergency brain surgery was required. Rangolan remained in a coma for six days.

Rangolan testified that since undergoing surgery, he had suffered head pains and had heard voices, and that both of those conditions were continuing and had worsened over time. He was also suffering from depression. In addition, despite taking Dilantin, an anti-seizure medication, he had suffered a number of seizures since the time of his assault. One of Rangolan's seizures caused a fall that injured his leg and back. In addition to taking Dilantin to prevent seizures, Rango-lan was taking medications for depression and hearing voices, as well as for pain in his head, leg, and back.

Dr. Jay Rosenblum, a neurologist who examined Rangolan shortly before trial, testified that the assault had caused a depressed fracture in the right temporal region of Rangolan's skull, *i.e.,* an object had caused a bone in Rangolan's skull to break and be pushed into his brain. This caused cerebral hemorrhaging and necessitated emergency surgery. As a result of these injuries, Rangolan suffered, *inter alia,* a cerebral concussion, post-concussion syndrome, and cerebral encephalopathy, which can result in "symptoms such as headaches, dizziness[,] irritability, change in personality, [and] change in ... habits," as well as brain damage. (Trial Transcript ("Trial Tr."), at 283.) In addition, Rangolan suffered from seizure disorder. Dr. Rosenblum testified that, with such a disorder, "you never know when you're going to have a seizure. No matter what happens you can be in very embarrassing situations and get depressed.... There are social situations that become a problem. It has been thought that there are sexual difficulties that occur as a problem." (Trial Tr. 277.) Although not a psychiatrist, Dr. Rosenblum opined that "[t]his certainly is enough to make anyone depressed." (*Id.*)

Dr. Rosenblum testified that Rangolan's ailments will be permanent. The surgery had left Rangolan with a scar that "goes in a U shape over the ear and then ends in the temporal area just about the level of the eye on the right side," and the scar "remained very tender" at the time of trial, more than three years later. (Trial Tr. 282.) Dr. Rosenblum testified that "[t]he likely scenario is that [Rangolan] is not going to get any better. He is going to have these seizures. The frequency of the seizures is something that you can try

to cut ... down. The brain damage is there that we see. The scar is there, so his prognosis is poor." (Trial Tr. 284–85.) Dr. Rosenblum testified that, despite regular medication, Rangolan "can have a seizure at any particular time." (Trial Tr. 279.) Even if a patient is "seizure[-]free for one[,] two[,] or three years[,] statistics say that [he] will have a 50 percent chance of having another seizure even if [he is] perfectly [seizure-]free for several years." (*Id.*) And "[t]he most devastating thing of all is that if you are going to have another seizure," you have no way of knowing "when will it occur and where." (*Id.*)

In light of the evidence, the district court concluded that the jury's award of $300,000 to Rangolan for pain and suffering in the three-plus years between the assault and the trial did not deviate materially from what would be reasonable compensation. The County has not pointed us to any case in which a New York court reduced an award for past pain and suffering for injuries of severity similar to Rangolan's to less than $300,000. The County cites the New York Judicial Review of Damages, which describes *James v. State of New York*, Claim No. 76912 (N.Y.Ct.Cl. Feb. 18, 1999), *see* 9 J.R.D. 13, as a case in which the New York Court of Claims awarded $250,000 for past pain and suffering to a plaintiff who suffered significant depressed open skull fractures, causing mild-to-moderate cognitive impairment, hearing impairment on one side, facial nerve damage and weakness on one side, residual weakness in his limbs, and impaired balance and coordination. But that case reflects simply the amount that the trial court awarded; it did not hold that $250,000 was the maximum allowable under New York law. The County's citation of *Cruz v. City of New York*, 201 A.D.2d 606, 607 N.Y.S.2d 969 (2d Dep't 1994) (mem.), in which the Appellate Division upheld a jury's $250,000 award, is similarly wide of the mark, for an affirmance of a verdict is not a holding that a larger verdict would have been impermissible. In short, the County has provided us no basis for a conclusion that the district court's refusal to reduce the award for Rangolan's past pain and suffering below $300,000 was an abuse of discretion.

■ With respect to future pain and suffering, the district court found that the jury's award of $1,250,000 deviated materially from what would be reasonable compensation but that Rangolan's ongoing injuries, primarily headaches and the risk of future seizures, warranted an award of $500,000. *See Rangolan I*, 51 F.Supp.2d at 243. In reaching that conclusion, the district court reviewed several cases in which New York courts had found jury awards for future pain and suffering, resulting from injuries whose severity could be considered similar to the severity of those suffered by Rangolan, to be excessive. In those cases, the awards allowed by the appellate courts ranged from $130,000 to $500,000. *See Holland v. Gaden*, 260 A.D.2d 604, 604–05, 688 N.Y.S.2d 668, 669 (2d Dep't 1999) (mem.) (award of $500,000 reduced to $250,000 for "fractured tibia, fibula, and glenoid"); *Martino v. Triangle Rubber Co.*, 249 A.D.2d 454, 671 N.Y.S.2d 524 (2d Dep't 1998) (mem.) (award of $330,000 reduced to $130,000 for concussion with resulting post-traumatic encephalopathy, contusion, damage to knee cartilage, chronic cervical lumbosacral sprain, and two herniated discs); *Lauter v. Village of Great Neck*, 231 A.D.2d 553, 647 N.Y.S.2d 524 (2d Dep't 1996) (mem.) ("*Lauter*") (award of $700,000 reduced to $500,000 for serious arm and chest wounds, shattered jaw, facial lacerations, and nerve damage resulting in partial paralysis and disfigurement of face); *Bartlett v. Snappy Car Rental, Inc.*, 214 A.D.2d 596, 626 N.Y.S.2d 499 (2d Dep't 1995)

(mem.) (award of $350,000 reduced to $250,000 for severe headaches and tremors that prevented the plaintiff from leading a normal and active life).

The County points out that in three of these four cases, the New York courts reduced damages awards to levels lower than the $500,000 awarded by the district court here, and it complains that the district court awarded "the highest amount allowed by the four decisions" (County brief on appeal at 39). That argument too misses the mark. As discussed above, the court should not reduce a jury verdict to less than the maximum previously held to be reasonable for injuries of similar severity. Thus, if Rangolan's injuries (causing him brain damage, continuing leg and back pains and headaches, a long scar on his head and face that remained sore more than three years later, depression, auditory hallucinations, potential sexual difficulties, and the permanent prospect of seizures that could occur at any time) were not substantially less severe than those of the plaintiff in *Lauter* (serious arm and chest wounds, a shattered jaw, facial lacerations and nerve damage resulting in partial facial paralysis and disfigurement) the district court could not, consistent with the Seventh Amendment, reduce the award to Rangolan below the $500,000 allowed in *Lauter*.

Perhaps in light of that principle, the County quarrels with the district court's premise that Rangolan has "the potential for having other seizures," *Rangolan I*, 51 F.Supp.2d at 243, and argues that "if [Rangolan] adheres to a prescribed schedule of medication, he need fear no seizures *ever*" (County reply brief on appeal at 13–14 (emphasis in original)). The County's hypothesis plainly does not take the evidentiary record in the light most favorable to Rangolan. The testimony of Dr. Rosenblum that even with regular medication Rangolan "can have a seizure at any [given] time" (Trial Tr. 279) and that "[t]he likely scenario is that [Rangolan] is not going to get any better. He is going to have these seizures" (Trial Tr. 284) supports the district court's conclusion as to the probability that Rangolan would suffer future seizures. Given Dr. Rosenblum's testimony that the timing of such seizures is entirely unpredictable, Rangolan's condition plainly limits the feasibility of such activities as his driving a car, operating machinery, or even climbing a ladder.

We conclude that it was well within the district court's discretion to find that Rangolan's future debilities were sufficiently comparable to those of the plaintiff in *Lauter* to warrant reduction to no less than the award sanctioned in *Lauter*. The award to Rangolan of $500,000 for future pain and suffering was within the district court's discretion and thus may not be overturned.

### 2. The Damages Awarded to Shirley for Loss of Consortium

Nor do we see any abuse of discretion in the district court's refusal to reduce below $20,000 the jury's award to Shirley for loss of consortium (referred to at trial as loss of "services"), *see generally Millington v. Southeastern Elevator Co.*, 22 N.Y.2d 498, 502, 293 N.Y.S.2d 305, 308, 239 N.E.2d 897 (1968) ("The concept of consortium includes not only loss of support or services, it also embraces such elements as love, companionship, affection, society, sexual relations, solace and more."); *Briggs v. Julia L. Butterfield Memorial Hospital*, 104 A.D.2d 626, 626, 479 N.Y.S.2d 758, 758 (2d Dep't 1984) (mem.) ("The essence of recovery for loss of services is to compensate for the loss of such elements as 'love, companionship, affection, society, sexual relations, solace and more' (*Millington v. Southeastern Elevator Co.*, 22 [N.Y.2d at] 502).").

The cause of action for loss of consortium is designed to "compensate for the injury to th[e marital] relationship" and to "the interest of the injured party's spouse in the continuance of a healthy and happy marital life." *Millington v. Southeastern Elevator Co.,* 22 N.Y.2d at 504–05, 293 N.Y.S.2d at 309–10, 239 N.E.2d 897. An award for loss of consortium may include components for both the past and the future. *See, e.g., Patterson v. Kummer Development Corp.,* 302 A.D.2d 873, 875, 755 N.Y.S.2d 180, 182–83 (4th Dep't 2003) (mem.); *Geltzer v. Leventhal,* 287 A.D.2d 435, 436–37, 730 N.Y.S.2d 873, 873–74 (2d Dep't 2001) (mem.). The fact that the spouses have lived apart during some of the period in question does not defeat the claim. *See, e.g., Rakich v. Lawes,* 186 A.D.2d 932, 934–35, 589 N.Y.S.2d 617, 619 (3d Dep't 1992).

██ In the present case, the complaint alleged, *inter alia,* that Shirley "ha[d] been deprived of the comfort, services, companionship and society of her husband." (Complaint ¶ 28.) The trial record includes evidence that Rangolan suffers from brain damage and depression; Dr. Rosenblum testified that Rangolan's injuries could result in irritability, personality change, and sexual difficulties. The district court concluded that, although the evidence of the actual impact on Shirley was scant, some loss of companionship or society "can be reasonably inferred from the state of marriage itself." *Rangolan I,* 51 F.Supp.2d at 244. And the County, while seeking a remittitur of the jury's $60,000 award, conceded that "clearly there is some loss here of society and companionship." (Hearing Transcript, April 30, 1999, at 17).

The County has not called to our attention any case holding that a loss-of-consortium award of $20,000 in circumstances such as these was excessive. Indeed, in the district court, the County declined even to suggest any particular dollar amount to which it believed the loss-of-consortium award should be reduced, stating that the district judge was "well acquainted with what would be appropriate compensation under the circumstances" (*id.*). Given the record as a whole, the County has provided no basis whatever on which we could conclude that the district court's refusal to reduce the award to Shirley below $20,000 was an abuse of discretion.

**B.** *The Taxation of Costs in Favor of USMS*

The County contends that the taxation of costs in favor of USMS for expenses in transporting Rangolan to and from court, and guarding him during those sojourns, was unauthorized by statute; alternatively, it argues that if anyone should pay those expenses, it is Rangolan, who was being detained through no fault of the County. The government, which, at the request of this Court, has submitted a brief—as *amicus curiae*—argues that the award of costs to USMS against the County should be affirmed; it also argues that, if the County is not required to pay those costs, such costs should be taxed against Rangolan. These contentions raise questions as to the types of USMS services that may be reimbursed through the taxation of costs, the extent to which those services may be so taxed, and the persons against whom such costs may be taxed.

1. *The Services Performed by USMS in the Present Case*

Habeas corpus *ad testificandum* is a writ, directed to the custodian of a prisoner, designed to have a prisoner brought to court from his place of detention ("*testificandum* writ"). The text of the initial

*testificandum* writ issued by the district court in the present case read as follows:

> TO: UNITED STATES DEPARTMENT OF
> IMMIGRATION
> C/O YORK COUNTY PRISON
> IMMIGRATION DEPARTMENT
> 3400 CONCORD ROAD
> YORK, PA 17047
> GREETINGS:
> YOU ARE HEREBY COMMANDED to have the body of Neville Rangolan, Inmate Number 52385 detained in the York County Prison ... under your custody, and that you (1) *deliver him to the custody of the United States Marshal for this District at the United States Courthouse,* 2 Uniondale Avenue, Uniondale, New York 11553, where he shall be held until he shall be delivered, under safe and secure conduct before Judge Arthur D. Spatt of the Eastern District Court at this courthouse, by 29th day of March, 1999 at 9:30 A.M. in the above captioned civil action; (2) Neville Rangolan shall be kept under safe and secure custody by the United States Marshal until the trial has concluded and as necessary, remanded to the custody of the Warden, Metropolitan Detention Center (MDC), 100 29th Street, Brooklyn, New York 11232; (3) *immediately upon the conclusion of the trial the United States Marshal shall notify you and you shall return Neville Rangolan to York County Prison in York, Pennsylvania* under safe and secure conduct.

(Writ of Habeas Corpus *Ad Testificandum* dated January 13, 1999 ("First Writ") (italics added).) In sum, the First Writ ordered federal immigration officials ("Immigration") to deliver Rangolan to USMS for trial, indicated that until the trial ended Rangolan's overnight detention would be at the Metropolitan Detention Center ("MDC") in Brooklyn, and stated that USMS would inform Immigration when the trial was over and that Immigration should then return Rangolan to his deportation-related place of detention.

In the interim between the issuance of the First Writ and its return date, Rangolan was apparently transferred to a federal immigration detention center in Manhattan. The court's second *testificandum* writ directed Immigration to deliver Rangolan from that center to the MDC on April 1, 1999, so that from there he could be turned over to USMS on April 12 to be brought to trial every day. (*See* Writ of Habeas Corpus *Ad Testificandum* dated March 26, 1999 ("Second Writ").)

Thereafter, "the Marshals Service transported Rangolan to the trial and related hearings on April 12, 19–22, 26–27 and 30" "[i]n accordance with" the Second Writ, and again on August 11, 1999, in accordance with a third, posttrial, writ. (Letter brief of United States as *amicus curiae* on this appeal, dated February 4, 2004 ("United States *amicus* brief"), at 2.) The $4,792.46 in USMS expenses taxed as costs against the County was for time, mileage, and meals as follows:

$4,550.00 for 182 deputy hours at $25 per hour

$ 206.46 in mileage, 666 miles, at $0.31 per mile

$ 36.00 for nine meals for Rangolan at $4 per meal

2. *Statutory Provision for Taxation of Costs in Favor of USMS*

 Rule 54 of the Federal Rules of Civil Procedure provides, in pertinent part, that

> [e]xcept when express provision therefor is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of

course to the prevailing party unless the court otherwise directs . . . .

Fed.R.Civ.P. 54(d)(1). Although a district court's refusal to tax particular expenses as costs against the losing party is reviewed only for abuse of discretion, *see, e.g., Japan Airlines Co. v. Port Authority,* 178 F.3d 103, 114 (2d Cir.1999); *In re Air Crash Disaster,* 687 F.2d 626, 629 (2d Cir. 1982); *see generally Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 442, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987), "the district court has no discretion to award costs not authorized by statute or contractual provision," *United States v. Merritt Meridian Construction Corp.,* 95 F.3d 153, 171 (2d Cir.1996); *see, e.g., Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. at 445.

■ The "term 'costs' as used in Rule 54(d)" is defined in 28 U.S.C. § 1920 (2000). *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. at 441, 107 S.Ct. 2494. Section 1920 expressly provides that costs may be awarded to the Marshals Service: "A judge . . . of any court of the United States may tax as costs . . . (1) Fees of the . . . marshal . . . ." 28 U.S.C. § 1920(1). Not all expenses of the marshal may be so taxed, however, for 28 U.S.C. § 1921 expressly lists what USMS expenses may be taxed as costs. Subsection (a)(1) of that section provides as follows:

.The United States marshals or deputy marshals shall routinely collect, and *a court may tax as costs, fees for the following:*

(A) *Serving* a writ of possession, partition, execution, attachment in rem, or libel in admiralty, warrant, attachment, summons, complaints, or *any* other *writ,* order or process in any case or proceeding.

(B) Serving a subpoena or summons for a witness or appraiser.

(C) Forwarding any writ, order, or process to another judicial district for service.

(D) The preparation of any notice of sale, proclamation in admiralty, or other public notice or bill of sale.

(E) The keeping of attached property (including boats, vessels, or other property attached or libeled), actual expenses incurred, such as storage, moving, boat hire, or other special transportation, watchmen's or keepers' fees, insurance, and an hourly rate, including overtime, for each deputy marshal required for special services, such as guarding, inventorying, and moving.

(F) Copies of writs or other papers furnished at the request of any party.

(G) Necessary travel in *serving* or endeavoring to *serve any* process, *writ,* or order, except in the District of Columbia, with mileage to be computed from the place where service is returnable to the place of service or endeavor.

(H) Overtime expenses incurred by deputy marshals in the course of *serving or executing* civil process.

28 U.S.C. § 1921(a)(1) (2000) (emphases added).

The government argues that the USMS expenses for the hours, mileage, and meals were incurred for the transportation of Rangolan to and from court "[i]n accordance with" the district court's *testificandum* writs (United States *amicus* brief at 2) and thus were properly taxed as costs pursuant to 28 U.S.C. § 1921(a)(1)(G) (*see* United States *amicus* brief at 6). Subsection (G), however, as shown above, authorizes the taxation of costs for travel expenses associated only with "serving" or attempting to "serve" a writ. And while this subsection may have some relevance to the present case, we reject the govern-

ment's contention that "serving a writ" either would ordinarily include, or was intended by Congress to include, transporting a prisoner.

"Service" of a writ refers to delivery of the writ to the person to whom it is addressed and to whom it gives an order or notice. *See, e.g., United States v. McMahon,* 164 U.S. 81, 87–88, 17 S.Ct. 28, 41 L.Ed. 357 (1896) (construing "service," as used in a predecessor of § 1921, as "ordinarily impl[ying] something in the nature of an act or proceeding adverse to the party served, or of a notice to him"). As a matter of normal usage, we do not interpret "service" of a writ to include performance "[i]n accordance with" (United States *amicus* brief at 2) its commands or goals. Rather, we would describe conduct in accordance with a writ as compliance with or execution of the writ. Service and execution plainly are not the same. *Compare Black's Law Dictionary* 1372 (7th ed.1999) (defining "service" as "[t]he formal delivery of a writ, summons, or other legal process"), *with id.* at 589 (defining "execution" as "[t]he act of carrying out or putting into effect (as a court order)").

Further, the structure of § 1921(a)(1) indicates that Congress did not mean to conflate those two concepts. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Duncan v. Walker,* 533 U.S. 167, 173, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (internal quotation marks omitted). Further, a statute generally "should not be construed so as to render a word or clause inoperative." *Bell v. Reno,* 218 F.3d 86, 91 (2d Cir.2000). Subsections (A), (B), (C), and (G) of § 1921(a)(1) refer only to costs that may be taxed in connection with a writ's "serv[ice]"; there is no mention of execution. In contrast, subsection (H), which will be discussed further below, refers to "serving *or executing* " (emphasis added). We are constrained to infer that the omission of "executing" from subsections (A), (B), (C), and (G) was intentional. And we must infer that the presence of that word in subsection (H) along with "serving" indicates that Congress intended the term "executing" to mean something different from "serving."

Moreover, assuming that transporting a prisoner whose presence is sought by habeas corpus *ad testificandum* falls within the scope of "executing" that writ, our view that executing the writ is not the same as serving it is consistent with the ways in which Congress has provided for Marshals Service fees and expenses to be taxed as costs in the past. Prior to 1948, the taxation of costs for services rendered by USMS was provided for in part as follows: "The following fees ... shall be taxed and allowed to marshals": "[f]or service of any ... writ, ... $2 for each person on whom service is made," 28 U.S.C. § 574 (1946) (first paragraph), plus "[f]or travel ... to serve any ... writ, ... 6 cents a mile," *id.* (23rd paragraph), and "10 cents a mile" per person "[f]or transporting criminals," *id.* (20th paragraph). Plainly Congress conceived of the service of writs and the transport of prisoners as different. The 1946 Code not only placed the two tasks in different paragraphs, it provided that travel expenses for the two were to be compensated at different rates.

In 1948, Congress amended Title 28, and the provision for taxation of marshals fees as costs was recodified at § 1921. The 1948 version of § 1921 retained the provision that taxable costs would include fees "[f]or service of any ... writ," plus 6 cents a mile "[f]or necessary travel in serving any process," Act of June 25, 1948, Pub.L.

No. 80–773, ch. 646, 62 Stat. 869, 956 (codified at 28 U.S.C. § 1921 (1952)); but it omitted the prior provision stating that costs could be taxed for the expense of transporting prisoners, *see id.* The 1948 amendment did not leave marshals unreimbursed for the latter expenses. It included a section stating that marshals were to be "allowed ... [t]he expense of transporting prisoners, including the cost of necessary guards and the travel and subsistence expense of prisoners and guards," 28 U.S.C. § 553(4) (1952). Had there been no other limiting provision, we might infer that § 553(4)'s use of the word "allowed" gave a court discretion to permit reimbursement either from the federal fisc or from a party through the taxation of costs. However, § 1921 provided unambiguously that *"[o]nly* the following fees of United States marshals shall be collected and taxed as costs," 28 U.S.C. § 1921 (1952) (emphasis added). Accordingly, we must infer that expenses "allowed" in § 553(4) but not listed in § 1921 could not properly be taxed as costs. Section 1921 detailed the categories of fees and expenses that could be taxed as costs, and the travel and subsistence expense of transporting prisoners was not included. *See* 28 U.S.C. § 1921 (1952).

In light of Congress's past statutory treatments of the service of writs as entirely different from the transportation of prisoners, we reject the government's contention that the current § 1921(a)(1)(G), which by its terms refers only to service, was meant to encompass prisoner transportation.

Nor do we see that any other subsection of the current § 1921(a), with the exception of subsection (H), allows USMS to recover as costs expenses associated with transporting a prisoner. We note that subsection (E) allows as costs fees for "special transportation" and "guarding"; but it seems clear that those terms, read in context—*e.g.,* "guarding, *inventorying,* and moving," 28 U.S.C. § 1921(a)(1)(E) (emphasis added)—refer to the transportation and guarding of property, not of prisoners.

Nonetheless, we do not regard subsection (G) as necessarily irrelevant to USMS's present request for costs. The *testificandum* writs here were addressed to Immigration; they compelled Immigration to yield custody of Rangolan temporarily by delivering him to USMS for the purpose of having him attend court proceedings. It may be that USMS served those writs on Immigration by delivering the court's orders; and if USMS did serve those writs personally, it is entitled to have the expense of mileage "from the place where service [wa]s returnable to the place of service," 28 U.S.C. § 1921(a)(1)(G)— plus, presumably, a service fee pursuant to § 1921(a)(1)(A); *see also* 28 C.F.R. § 0.114(a) (establishing fees for personal service and for service by mail)—taxed as costs. USMS will be free on remand to pursue a request under subsections (A) and (G) that such fee and expenses as are warranted for service of the *testificandum* writs on Immigration be taxed against the County. Those subsections, however, do not authorize taxation of costs for transporting a prisoner.

Subsection (H), in contrast, makes provision for certain expenses in "serving *or executing* civil process." 28 U.S.C. § 1921(a)(1)(H) (emphasis added). "[P]rocess" plainly includes writs of habeas corpus *ad testificandum, see, e.g., Black's Law Dictionary* 1222 (7th ed.1999), and we think it reasonable to interpret "executi[on]" of the *testificandum* writs at issue here as encompassing USMS's transportation of Rangolan to and from court and guarding him. The purpose of the writs was to have Rangolan brought to court. Although the writs were directed to Immi-

gration, their goal was not to be fully accomplished by Immigration itself, for they ordered Immigration only to (a) deliver Rangolan to the Marshals Service by a certain date and (b) pick him up from the MDC, his interim place of detention, when informed by USMS that the pertinent court proceedings had ended. The bottom-line goal of the writs—Rangolan's appearances in court in USMS's "secure custody" (First Writ at 2)—was ultimately achieved by USMS, which transported Rangolan from MDC to court and guarded him. Given that the purpose of the writs was not accomplished without those tasks' being performed by USMS, we regard the USMS assistance as part of the execution of the writs, and hence as a task that is within subsection (H).

Subsection (H), however, allows only "*[o]vertime* expenses incurred by deputy marshals in the course of serving or executing civil process." 28 U.S.C. § 1921(a)(1)(H) (emphasis added). Accordingly, the hours spent by USMS deputies in transporting and guarding Rangolan, construed as execution of the *testificandum* writs, are taxable as costs only to the extent that they were overtime.

The government also argues that fees for transporting prisoners are generally taxable as costs because § 1921 was amended in 1988 to require the Attorney General to "prescribe by regulation the fees to be taxed," 28 U.S.C. § 1921(b), because that subsection also states that "[s]uch fees shall, to the extent practicable, reflect the actual and reasonable cost of the service provided," *id.*, and because the "regulations prescrib[e] ... fees for 'process served or executed'" (United States *amicus* brief at 7 (quoting 28 C.F.R. § 0.114(a)(3))). Again, we disagree. Prior to 1988, § 1921 itself set the fee levels permissible for the various types of USMS

services. *See, e.g.,* 28 U.S.C. § 1921 (Supp. V 1987). The new subsection (b) states that the Attorney General "shall from time to time prescribe by regulation the fees to be taxed and collected under subsection (a)." 28 U.S.C. § 1921(b) (2000). The 1988 changes were designed simply to

amend[ ] current law to allow the Attorney General to set fees collected from non-federal entities by Marshals in civil and criminal matters at levels reflecting the actual cost of the service provided. Current law explicitly sets the fee for the particular service performed.

H.R. 5210, 134 Cong. Rec. S17360–02 (Nov. 10, 1988), *available at* 1988 WL 182529. By introducing subsection (b), allowing the precise dollar levels to be prescribed "from time to time" by regulation, Congress avoided the need for repeated statutory amendments to allow USMS fees to keep pace with inflation. The regulations do not, as the government suggests, authorize the taxation of any category of costs not provided for in the statute. To the contrary, the statute allows the Attorney General only to set "the fees to be taxed and collected *under subsection (a).*" 28 U.S.C. § 1921(b) (2000) (emphasis added). Thus, though the Attorney General sets the dollar figures, he has not been given authority to expand the categories of services for which reimbursement may be had through the taxation of costs. Those categories are fixed by § 1921(a)(1).

In sum, § 1921 gives the district court authority to tax costs in favor of the Marshals Service for the expense of serving a writ and for deputy marshals' overtime expense incurred in executing a writ. The USMS request to the district court did not itemize the Marshals Service's expenses sufficiently to permit determination of whether, or to what extent, its request fell within those categories. Accordingly, we

vacate so much of the 1999 Judgment as ordered the County to pay $4,792.46 in costs to USMS, and we remand for further proceedings to permit such a determination.

### 3. *The Party Against Whom Costs May Be Taxed*

Finally, we reject the suggestions of the County and the government that if their respective positions are not upheld, USMS's unreimbursed expenses should be taxed against the Rangolans. Their positions are untenable for several reasons. First, the County, while it may properly argue that costs should not have been taxed against the County, has no standing to designate what other party should make payment of any amount due USMS.

Second, the government, while it does not lack standing, has done nothing to preserve its right to assert in this Court a right to reimbursement from the Rangolans. The district court expressly rejected the contention that the Marshals Service expenses should be taxed against the Rangolans. (*See* Sept. Hearing Tr. 7.) If the government wished to have that determination reversed, it was incumbent on the government to file a cross-appeal, at least conditionally challenging that ruling in the event that this Court overturned the taxation of costs in favor of USMS against the County. *See, e.g., Morley Construction Co. v. Maryland Casualty Co.*, 300 U.S. 185, 191, 57 S.Ct. 325, 81 L.Ed. 593 (1937) (an appellee generally "may not ... in the absence of a cross-appeal ... attack the [district court's] decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary, whether what he seeks is to correct an error or to supplement the decree with respect to a matter not dealt with below" (internal quotation marks omitted)); *see also Kaplan v. Rand*, 192 F.3d 60, 67 (2d

Cir.1999) (a "nonparty may appeal when the nonparty has an interest that is affected by the trial court's judgment" (internal quotation marks omitted)). Although "the requirement of a cross-appeal is a rule of practice which is not jurisdictional and in appropriate circumstances may be disregarded," *Finkielstain v. Seidel*, 857 F.2d 893, 895 (2d Cir.1988), "[e]xercise of the power [to disregard the failure to cross-appeal] has been rare, ... requiring a showing of exceptional circumstances," 15A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3904, at 228 (2d ed.1992). No such circumstances have been suggested here. This appeal was reinstated by the County's filing of a new notice of appeal in April 2003. The government not only did not file a notice of cross-appeal, it did not even file a brief in opposition to the County's appeal until expressly requested by this Court to do so in 2004.

Finally, Rule 54(d)(1) provides that costs may be "allowed ... *to* the prevailing party." Fed.R.Civ.P. 54(d)(1) (emphasis added). As the government's *amicus* brief repeatedly notes, nothing allows costs to be taxed against the prevailing party. (United States *amicus* brief at 9 ("54(d)(1) ... provides only for taxation against a losing party to the litigation"); *id.* at 5 ("costs may be taxed against only the losing party").) The Rangolans are the prevailing parties in this action. We see no authority that provides for the taxation of any costs against them.

## CONCLUSION

We have considered all of the contentions of the County and the government on the County's appeal and, except to the extent indicated above, have found those contentions to be without merit. Plaintiffs' cross-appeal is dismissed. The 2003 Judgment is affirmed. The 1999 Judgment is

vacated to the extent that it awarded USMS $4,792.46 in costs against the County, and the matter is remanded for a determination, in accordance with the foregoing, of what USMS expenses are properly taxable as costs against the County under 28 U.S.C. § 1921(a)(1), to wit, for service of the district court's *testificandum* writs and for overtime expense in transporting Rangolan to and from court and guarding him during those trips.

Plaintiffs shall recover their costs from the County on the appeal; each side shall bear its own costs on the cross-appeal.